Robert N. CORLEY, Individually and as executor of the estate of Vera M. Corley, deceased, Plaintiff,

v.

ROSEWOOD CARE CENTER, INC. OF PEORIA, et al., Defendants.

No. 95–3350.

United States District Court, C.D. Illinois, Springfield Division.

July 13, 2001.

Richard L. Steagall, Nicoara & Steagall, Peoria, IL, for plaintiff.

David J. Dubicki, James W. Springer, Kavanagh, Scully, Sudow, White & Federick, PC, peoria, IL, Stephen L. Ukman,

Steven M. Hamburg, Summers, Compton, Wells & Hamburg, St. Louis, MO, for defendant.

### ORDER

SCOTT, District Judge.

This matter comes before the Court on cross motions for summary judgment. The Plaintiff Robert Corley alleged that he and his mother Vera Corley, deceased, were victims of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–68. For the reasons set forth below, the Court grants the Defendants' Second Motion for Summary Judgment. Corley has failed to present evidence that would, if believed by a jury, establish a pattern of racketeering that injured him or his late mother. He, therefore, cannot recover on his RICO claims.

### FACTS

#### A. Defendants' Business Operations

Since 1987, individual Defendants Larry Vander Maten and Darrell Hoefling have directly or indirectly owned and operated a network of corporations and other entities (some of which constitute the remaining Defendants in this case), that own and operate nursing homes. The first home opened in Swansea, Illinois, in 1987. The combination of entities now operates fourteen homes. Each home uses the name Rosewood Care Center. One holding company owns each home's separate operating corporation. Each home uses the same management company. Each home's ownership and operation are organized through the same system of leases, management contracts and other agreements. Since 1993, patient census and billing for all homes have been centralized. Each home transfers revenues to the same central bank account. Each home also uses the same sales brochure, and the advertising for all homes is purchased centrally by the single management company.

#### B. Corley's Dealings with Defendants

In October 1989, Robert Corley visited the Rosewood Care Center Inc. of Peoria. The Peoria home had recently opened in June 1989. Robert Corley looked at the home as a possible place to care for his mother Vera Corley. Peoria Rosewood employee Valerie Mushrush showed him around the home. The home had three room choices: a private suite; private room; and semi-private room which had two beds. Robert Corley[1] said that Mushrush emphasized the suites. The suite was larger than a regular private room. The suite cost $12 per day more than a semi-private room: the private suite was $70 a day; the semi-private room was $58 per day. Corley said that he was led to believe that the price of the private suite would stay in line with the other rooms. Mushrush told Corley that his mother could bring her own furniture from home. She told him that residents have a choice of two entrees at every meal. He also was led to believe that the home provided a high-quality of care for residents.

Mushrush stated in her deposition that she was told to market private suites. She also states that she did not think that prices would increase for one year. She communicated that belief to some customers, although she did not remember whether she told this to Corley.

Based on his inspection of the home and Mushrush's representations, Corley decided to place his mother in the home in a private suite.[2] Corley signed a contract

---

1. Throughout this order, the use of the name Corley alone refers to Robert Corley.

2. Vera Corley's condition did not allow her to participate in this decision. All representations and other communications were between the Defendants and Robert Corley.

for a private suite at a base rate of $70 per day.[3] The contract said, "We do not guarantee your accommodations will remain private throughout your stay with us." Corley and Mushrush initialed a change in the contract which struck the following sentence from the contract, "~~For administrative or other reasons, we may convert any private room to a semi-private room upon —— days prior written notice, with an appropriate adjustment in your base rate.~~" The contract also said the home could raise the base rate at any time on 30 days notice.

Defendants also advertised a guarantee of continuing care in 1989 in Peoria. The advertising indicated that if a resident's money ran out, the home would continue to provide the resident with the same level of care. The continuing care would be paid by Medicaid. Contrary to the advertising, the form residential contract at the Peoria home stated that the home was not qualified to accept Medicaid patients, and there was no guarantee that it would be qualified in the future. The contract further said that continuing care could only be provided if the home qualified for Medicaid. Defendants advertised the guarantee of care in advertising that marketed jointly the Peoria home and the home that the Defendants opened at about the same time in East Peoria, Illinois.

Robert Corley was not concerned about the guarantee of continuing care when he decided to place his mother in the Peoria facility. He believed she had ample funds to pay for her own care. Corley stated that the guarantee of continuing care, "was a plus. It might have been 5/10 of one percent of the good things about Rosewood." Corley August 15 and 16, 1994, Deposition at 240. Later in the same deposition, he stated that the guarantee of continuing care, "was not a factor in the decision at all. It was a plus.... I didn't give it that much thought or that much consideration." *Id.* at 254. Corley also stated that he understood that the home was not qualified for Medicaid at the time he signed the contract.

Vera Corley moved into the Peoria home on or about October 25, 1989. She moved her personal furniture into the suite. She paid to install her own carpeting and a single telephone line.

On December 14, 1989, about sixty days after Vera Corley moved into the home, the home administrator wrote Robert Corley to suggest that he move his mother to a regular private room or a semi-private room. The letter said that the base rate on private suites would go up January, 1990, from $70 per day to $84 per day. This was a 20 percent increase. Corley complained by letter dated December 31, 1989. He said that he felt that he was the victim of a classic bait and switch. On January 5, 1990, Vander Maten telephoned Corley in response to the complaint. After the telephone conversation, the rate increase for his mother was delayed until March 1, 1990. Two more price increases followed in 1990. The base rate for all rooms rose $4 per day on March 30, 1990; Vera Corley's room rate then was $88 per day. The rate for the private suite rose to $122 per day on October 24, 1990. This was a 74 percent increase over the original rate of $70 per day. The base rate for a semi-private room rose only 13.7 percent for the same period, from $58 per day to $66 per day.

Corley complained to the Illinois Attorney General. Attorney Stephen Ukman represented the Defendants at that time. He responded to the complaint on behalf

---

**3.** This rate was for the lowest level of care, Level I. Care levels increased to the highest level, Level IV. Throughout this Order, price comparisons are for Level I care. Price differentials at other levels seem to have been similar.

of the Peoria home by letter dated December 18, 1990. Vander Maten approved the letter before it was sent.[4] Ukman explained that the Peoria Center was licensed by Illinois for 120 beds. The rooms under the license were either single-bed rooms or double-bed rooms. He stated,

> When Rosewood Care Center opened in June, 1989, a number of double-bed rooms were equipped with only one bed and designated as "suites". Mr. Corley's mother has resided in a suite since her admission in October, 1989. Essentially, a suite is a semi private room with only one bed but still suitable for two residents.

Ukman claimed that Corley actually received a discount when he placed his mother in the home. According to Ukman, the stated rate for a suite was $84 per day. Thus, Corley received a discount of $14 per day initially. The evidence concerning whether there was a discount is conflicting. Mushrush said she did not give Corley a discount.

Ukman explained that the price increases reflected increasing costs and demands for beds. He stated that the initial price increase, "was brought on by the mushrooming occupancy of the facility and demands for beds." He stated that the last price increase, "was brought about by the continuing growth of the facility. Because of a shortage of semi-private rooms, Rosewood was having to turn away individuals needing care."

He also stated that Corley was advised of the possibility of price increases due to demand for semi-private rooms,

> At the time Mrs. Corley was admitted, management of the facility had advised Mr. Corley that the availability and price of private suites was unique to the

period while the facility was filling up, and were subject to change. This was reinforced by Mr. Vander Maten in his conversation with Corley in January, 1990.

Corley disputes that any such statements were made to him.

## C. The First Summary Judgment Decision

Corley then brought this action against the Defendants. Corley alleged that he and his mother were victims of racketeering in violation of RICO. The complaint also alleged supplemental state claims. In 1995, Judge Mihm of this District granted summary judgment to the Defendants. Order entered September 27, 1995 (d/e 535). He found that Corley did not establish a pattern of racketeering. The Seventh Circuit reversed because Corley was denied the opportunity to discover evidence of a pattern of racketeering. *Corley v. Rosewood Care Center, Inc. of Peoria,* 142 F.3d 1041, 1049–55 (7th Cir.1998). After the case was remanded, Vera Corley died. Her estate has been substituted as a party to this action. The parties have now completed discovery.

## D. Additional Evidence of a RICO Pattern

### 1. Bait and Switch

Corley has now submitted to the Court additional evidence of a pattern of racketeering. First, Corley uncovered a few old price lists for other homes. Exhibits 6 and 11 to Plaintiff's Response to Defendants' Motion for Summary Judgment (d/e 1035 and 1036) (hereinafter referred to as Response Exhibits). One price list for the Swansea, Illinois, home is dated February 17, 1989. The price list states that the

4. In a later affidavit Vander Maten said he only reviewed the letter for accuracy, but he believed the letter was accurate. This difference is immaterial for purposes of this Order.

stated prices would be effective April 1, 1989. The list shows that the price for a private room with shower was $68 per day. The price for a "Display Suite" was $88 per day. Another price list for the Swansea home states that the rates listed would be effective August 20, 1990. This list put the price for a semiprivate room at $68 per day, a private room with shower at $96 per day, and a private display suite at $130 per day.

Two of the remaining price lists submitted do not identify the home(s) to which they apply. One such price list shows semi-private rooms as of January 1, 1990, to be $63 per day and display suites to be $93 per day. Another such list indicates that prices as of November 1, 1988, were as follows: semi-private room $51 per day, private room with shower $59 per day, and suite display $69 per day. The remaining price lists in the exhibits all relate to the Peoria home and reflect the price increases in 1989 and 1990 discussed above.

Corley states that these price lists show that the Swansea home initially had a $6 differential between private suites and semi-private rooms ($46/$52). Plaintiff's Statement of Undisputed Facts ¶ 5.d. Corley states that the Swansea homes ultimately went to a $56 price differential ($74/$130). *Id.* Corley states that the Galesburg home had an initial price difference of $6 between semi-private rooms and private suites ($46/$52). He states that the ultimate price difference in Galesburg was $60 ($63/$123). He cites the price lists discussed above to support these assertions. The calculations, however, do not seem to relate to the figures on the exhibits. For example, none of the price lists in Exhibits 6 or 11 contains either a $46 or $74 rate for a semi-private room. Defendants dispute the reliability of these documents in any event because the documents may be drafts that were never used.

Corley submitted no records to indicate whether any of these price lists were used.

Corley also submitted excerpts from an undated marketing manual produced in discovery. The manual stated, in part, that,

> Each facility should have their operation standardized to match HSM Development's policies and philosophies. The public will then know what to expect no matter which HSM Development facility they enter.

Response Exhibit 5, Schmidgall Deposition Ex. 1 at 6. The manual also indicated that letters should routinely be sent to prospective customers kept on mailing lists, and also in response to telephone inquiries. The manual excerpts submitted did not contain instructions to emphasize private suites over other types of rooms.

### 2. *Two Entrees*

The Peoria home manager Ron Wroblewski came up with the idea to offer a choice of two entrees per day as a selling point for the Peoria home. No other home ever used this selling point. Defendants stopped offering a choice of two entrees in July 1990, approximately thirteen months after the home opened. During the thirteen month period, residents were given a choice of two entrees.

### 3. *Inadequate Care*

Corley presented evidence of inadequate care of the following residents of Defendants' fourteen homes: (1) Margaret Pusch in the Peoria home in 1989 and 1990; (2) Steve Byrne in 1997; (3) Martha Johnson in the Peoria home in 1999; (4) Doris Schlink in 1999 in the Peoria home; and (5) Leo Rhode in the Edwardsville, Illinois, home in 1997. Corley stated that his mother also received poor care. The evidence indicates that the homes were

understaffed and budgets for food were inadequate.

Corley presented evidence from the following health care employees of Defendants' who thought care was inadequate in the respective homes in which they worked: (1) Vivian Frye, a Licenced Practical Nurse (LPN), who worked in the Peoria home in 1990 and 1991; (2) Susan Noel, a Registered Nurse (RN), who worked in the Peoria home in 1989–90; (3) Jacqueline Janssen, a Certified Nurse's Assistant (CNA), who worked in the East Peoria home in 1998; and (4) Viollette King, a CNA who worked in the Alton, Illinois home in 1995. In addition, Defendants' policy was to meet minimum standards for nursing home licensing.[5]

### 4. Misrepresentations in the Brochure

Corley also submitted evidence to show that statements from the Defendants' brochure were false. The brochure[6] contained the following statements:

A nurse, not unlike a maitre'de, looks after the quality of food, service, and well being of the guests during each meal.

One of the features of the Rosewood Care Center is a unique system of nursing shifts . . .

To be able to provide care when it is needed most, the morning shift arrives and joins the previous shift during this crucial time. With all hands-on board, charts are prepared. Each individual is greeted and the morning routines are

completed. Changes in condition are reported to the director of nursing. A system of doubled personnel and double effectiveness.

Rosewood has registered nurses and licensed practical nurses on duty day and night seven days a week.

The physician is given regular reports on the medical condition of the patients.

Vicky Lyons, Director of Nursing at the Peoria home from April, 1989 to April, 1990, testified that no nurse acted as a maitre'de during dining. Other evidence corroborated her statement on this question. Lyons also testified that standard practice at all of the homes called for nursing shifts to overlap one-half hour. This allowed nurses to communicate with each other about the status of residents and to update charts. Lyons said there was nothing unusual about the 30 minute overlap; it was standard in every health care establishment in which she has worked.

Gwen Flach was the Defendants' Corporate Director of Nursing. She testified in her deposition that Rosewood homes follow Medicare regulations concerning nurse staffing. These regulations require having one RN on the Medicare hallway at least one shift during the twenty-four hour day. Either LPNs or RNs are to be on duty on every shift. She stated that nursing staff is also adjusted to meet the particular needs of specific residents. She also testified that nurses give oral reports to doc-

5. Corley also submitted a request to admit which asserted problems with regulatory compliance at the East Peoria home. The Defendants did not admit that the assertions were true. Such disputed requests are not evidence that can be used to support a motion for summary judgment. Fed.R.Civ.P.56(e). Plaintiff should have submitted the documents on which the requests to admit were based accompanied by proper foundation and authentication through affidavit or otherwise.

6. Vander Maten submitted an affidavit stating that the brochure changed in 1998. Corley moved to strike the affidavit. Without deciding the motion, the Court will not consider the affidavit because it does not affect the outcome of the case. The Court will assume the same brochure language was used throughout the course of Defendants' operations.

tors when the doctors come to the home. They also call the doctors if there is a need. They do not send written reports to doctors.

### 5. Guarantee of Continuing Care

Several residents of the Peoria and East Peoria homes believed that they were deceived by the claim of a guarantee of continuing care at the Peoria and East Peoria homes. The Peoria home never became qualified to accept Medicaid patients. The Peoria home administrators told residents who wished to take advantage of the guarantee of care to move to the East Peoria home. Several did. Later, the East Peoria home stopped participating in Medicaid and stopped providing care to existing Medicaid residents.

Several sued in Illinois state court and won. *Hopp v. Rosewood of East Peoria,* (Tazewell, Illinois, County Circuit Court, Docket No. 92 L 4). The judge in the state court proceeding stated that the Defendants were still advertising a guarantee of continuing care as late as 1995 in the Peoria area.[7]

### 6. Cover Up Activities

Corley alleges that Defendants and their counsel have been fraudulently attempting to cover up the racketeering activities since 1990. Corley cites the Ukman 1990 letter as an effort to cover up the scheme. He also cites several statements made during these proceedings, either at hearings, in submissions to the Court, or in responses to discovery requests. Defendants argued this point in their memorandum, but submitted no separate evidence addressing

this issue. Corley also did not submit any evidence specifically on this claim.

### LEGAL STANDARD

At summary judgment, Defendants must present evidence which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider the evidence presented in the light most favorable to Corley. Any doubt as to the existence of a genuine issue for trial is resolved against the Defendants. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the Defendants have made a showing of an absence of issues of material fact, Corley must present evidence to show that issues of fact remain. *Matsushita Elec. Ind. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 576, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence must be sufficient to overcome a motion for directed verdict at trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Corley's evidence of a pattern of racketeering that injured him or his mother does not meet this standard.

 To establish any RICO claim a Plaintiff must show that one or more defendants conducted an enterprise through a pattern of racketeering activity that caused injury to the Plaintiff. 18 U.S.C. § 1962; *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016 (7th Cir.1992). "Racketeering activity" is defined as one or more specific criminal acts. 18 U.S.C. § 1961(1). Corley alleges that the Defendants conducted an enterprise through a pattern of mail fraud and wire fraud (hereinafter col-

---

**7.** Defendants dispute this statement by the state court judge. Corley argues that the statement is binding on this Court. As explained below, the Court does not decide this issue because Robert and Vera Corley suffered no injury from this misrepresentation;

they, therefore, cannot pursue a RICO claim based on the guarantee of continuing care regardless of whether the misrepresentation constituted a pattern of mail fraud or whether it continued until 1995.

lectively referred to as mail fraud). 18 U.S.C. §§ 1341 & 1343. Mail fraud requires proof of (1) a scheme or artifice to defraud with the intent to defraud; (2) through a deception about a material fact; and (3) the use of the mails (or interstate telecommunication) to further the fraud. *Id.; Neder v. U.S.*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).[8]

 A "pattern" of racketeering activity consists of repeated, discrete racketeering acts (predicate acts) that have (1) a relationship to each other and (2) sufficient continuity to show an ongoing threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238–39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Once Corley has presented evidence of a pattern of racketeering, he must also show that he or his late mother personally suffered an injury as a result of this pattern. *Summit Properties, Inc. v. Hoechst Celanese Corporation*, 214 F.3d 556, 558 (5th Cir.2000).

## ANALYSIS

 Corley can establish a continuity of racketeering activity by showing either (1) a period of long term repeated conduct, or (2) past conduct that by its nature projects into the future with a threat of repetition. *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893. The key issue is showing a threat of future criminal conduct. *Id.; Vicom*, 20 F.3d at 779–80. In viewing the evidence of predicate acts this Court must consider: (1) the number and variety of

predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries. *Vicom*, 20 F.3d at 780. The Court must apply these factors to achieve a, " 'natural and common sense' result, recognizing that 'Congress was concerned in RICO with long-term criminal conduct.' " *Id., (quoting U.S. Textiles, Inc. v. Anheuser–Busch Companies, Inc.*, 911 F.2d 1261, 1267 (7th Cir.1990) *quoting H.J., Inc.*, 492 U.S. at 237, 109 S.Ct. 2893).

Corley has identified several areas in which he claims Defendants committed mail fraud. He claims that these areas show a RICO pattern of mail fraud. The evidence does not support a finding of a pattern of racketeering activity in any but one of the areas. The promise of a guarantee of continuing care may constitute a RICO pattern of racketeering, but Corley and his mother suffered no injury from this scheme. The evidence of all the predicate acts taken together does not show a threat of long term criminal conduct that injured Corley or his mother.

### A. *Bait and Switch*

 Corley first claims that the bait and switch tactic in the marketing of private suites constitutes a pattern of mail fraud. He has presented evidence, which if believed, would show misrepresentations to him that could constitute a fraudulent bait and switch scheme. Corley was told that price differential between private

---

**8.** Defendants argue vigorously that Corley has failed to establish a pattern of mail fraud because he has not identified specific victims who were harmed or deceived by the alleged fraud. Plaintiff counters that he is not required to identify victims because injury and reliance are not elements of mail fraud. The Court agrees that Corley does not need to prove injury to others to establish discrete acts of mail fraud. *Neder*, 527 U.S. at 25, 119 S.Ct. 1827.

The existence of discrete predicate acts of fraud, however, does not establish a pattern. As discussed below, the number of other victims and the type of injuries are relevant to determine the existence of a pattern. *Vicom v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779–80 (7th Cir.1994). Corley also must prove that the RICO pattern of racketeering injured either him or his mother.

suites and semi-private room rates would remain relatively constant. Based, in part, on this representation Vera Corley moved into the Peoria home and paid for a separate telephone line and carpeting. Defendants then pressured Corley either to pay exorbitant rate increases or accept a roommate in his mother's suite. Mushrush's statements in her deposition would support this claim. She states that she told potential customers that she did not believe rates would go up for a year. She also said she was told to market private suites.

Ukman's letter can also support a finding of a bait and switch scheme. Ukman states that the private suite room was really a double, semi-private room. Corley was never told that the room was really a semi-private room. When the home first opened, the home offered some of the semi-private rooms as private suites until the home filled up. At that point the home planned to raise prices on private suites to force residents in private suites to switch to semi-private rooms. This statement could show that the Peoria home anticipated the price increase on private suites when it rented the private suite to Vera Corley.

Ukman says Corley was told that the prices would go up once the home filled up and needed to convert the suites into semi-private rooms. If the home adequately disclosed the anticipated price increases there would be no fraud. Corley says he was told the price differential between rooms would remain relatively constant. This factual dispute would overcome summary judgment if Corley had brought solely a state law fraud or consumer protection claim.

Corley, however, chose to assert a RICO claim. He, therefore, must also establish a pattern of racketeering activity. To do this, he must show some ongoing practice that creates a risk of continued criminal conduct. This bait and switch in 1989–90 at the initial opening of Rosewood Peoria was by definition a relatively short lived scheme. It was designed to end as soon as occupancy rates rose to sufficient levels to require filling the other semi-private beds licensed to be placed into a suite. This short lived scheme in Peoria does not create a risk of continued criminal activity necessary to show a pattern of racketeering activity. *Midwest Grinding*, 976 F.2d at 1022 (repeated acts must cover a "substantial period of time").

Corley argues that the bait and switch scheme was a business practice used by Defendants when opening their other nursing homes. Such a repeated scheme would establish an ongoing long-term pattern of racketeering activity that would meet the continuity requirements of RICO. Corley, however, does not present sufficient evidence to support his contention for summary judgment purposes.

Corley has submitted price lists from the Swansea home and unidentified price lists which he claims relate to the Galesburg home. He says they show a pattern of increasing price differentials between suites and semi-private rooms similar to the facts of the Peoria home. The calculations in Corley's Statement of Undisputed Facts, as noted above, do not seem to relate to the exhibits submitted; however, the two price lists from the Swansea home show increases in price differential between suites and other rooms from 1989 to 1990: the differential between private rooms and suites went from $20 to $34 in one year.[9] In addition, the Ukman letter shows a conscious decision to offer private suites at low rates initially, knowing that

9. The prices in 1989 were $68 for private room and $88 for a Display Suites. In 1990, the prices were $96 and $130, respectively.

the rate would increase once the semi-private beds began to fill. This may show a deliberate business plan to offer private suites as a marketing tool to fill beds knowing that either (1) the rooms would eventually be converted to semi-private rooms or (2) residents would pay a substantial premium for suites.

Corley, however, has presented no evidence of any misrepresentations made about prices of private suites at the opening of any other home. His evidence consists of representations made to him, and, perhaps, Mushroom's representations to other Peoria home customers in 1989. Corley argues that he is not required to show injury to others. The Court agrees; he is not required to present evidence of injury to a victim to show an act of mail fraud. But, he is required to show that Defendants made materially deceptive statements about private suite prices to potential residents at other homes with the intent to defraud them. He has presented no evidence on this point.

■ Corley argues that the organized nature of the Defendants' business is sufficient evidence of a pattern. He argues that each home was operated the same as every other; therefore, if they did it at one home, the Court must infer that they did it in every home. The Court disagrees. A pattern can be proven by showing that a particular racketeering activity was the regular business practice of a given entity. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. Corley, however, needs evidence to show that misrepresentation concerning the pricing and availability of private suites was a regular activity. He has presented evidence that one person, Mushrush, made misrepresentations to one person, Robert Corley. That does not establish that the representations she made were part of the Defendants' regular business activity elsewhere. He has not presented sufficient evidence of a pattern of a bait and switch scheme at the opening of Defendants' other homes to give rise to a genuine issue of fact.

### B. *Quality of Care*

■ Plaintiff also claims mail fraud in the representation that Rosewood Care Centers provide high-quality care. Defendants represented to the public that their homes provided high-quality care. Corley's evidence that this representation was false consists of:

a. Inadequate care to six former residents: five of whom were at the Peoria home; two in 1989 and 1990 (his mother and Margaret Pusch), one in 1997 (Steve Byrne), and two in 1999 (Martha Johnson and Doris Schlink); and one who was at the Edwardsville, Illinois home in 1997 (Leo Rhode);

b. Statements by four health-care professionals that the home in which they worked provided inadequate care; three of whom worked at the Peoria home (Vivian Frye in 1990 and 1991; Susan Noel in 1989–90; and Jacqueline Janssen in 1998); and one who worked at the Alton, Illinois home (Viollette King in 1995); and

c. A policy to meet minimum licensing requirements.

■ This minimal evidence is simply too sporadic and anecdotal to establish that an issue of fact exists regarding whether Defendants' representations of quality care were either false or part of a scheme to defraud. The Defendants have operated fourteen nursing homes over fourteen years; thousands of patients and hundreds of workers have passed through the doors of those homes. Yet, Corley presents this Court with complaints from the families of only six former residents and four former employees. This evidence contains signifi-

cant gaps: no complaints from 1992 through 1994, 1996 or 1998; and no complaints from anyone about eleven of the fourteen homes. Sporadic activity does not constitute a pattern. *H.J.*, 492 U.S. at 239, 109 S.Ct. 2893.

Similarly, the fact that Defendants' homes have a policy to meet minimum licensing requirements alone does not tend to prove the representations about care to be false. Corley has presented no evidence of the level of care required by regulation. Corley has failed to present evidence to show that issues of fact exist regarding whether Defendants' claims about quality of care constitute mail fraud.

C. *Two Entrees*

■ Corley has also failed to show that the representation that the Peoria home would offer a choice of two entrees was part of a RICO pattern of mail fraud. Only the Peoria home made this representation, and only for thirteen months. Thus, this claimed scheme was limited both in time and in location. Corley has presented no evidence of a continued threat of criminal activity from this short-term experiment with offering two entrees. Without evidence of a threat of long-term criminal conduct, Corley fails to meet his burden. Also, the residents received a choice of two entrees for the thirteen month period. Residents, therefore, actually received what was promised, at least for a time.[10]

D. *Representations in the Brochure*

■ Corley has failed to present evidence showing that the quoted statements in the brochure constitute mail fraud. He claims that the brochure deceptively and falsely stated that Defendants' homes: (1) use a nurse to act as a maitre'de during

meals, looking after the quality of food, service, and well-being of the residents; (2) use a unique system of double shifting when the morning shift arrives; (3) have RNs and LPNs on duty day and night seven days a week; and (4) give regular reports to physicians on residents' conditions.

■ The evidence, however, demonstrates that most of these statements are accurate, and no evidence shows that any of the discrepancies are material. Misrepresentations must be material to constitute mail fraud. *Neder*, 527 U.S. at 20, 119 S.Ct. 1827. A false statement is material if it has a natural tendency to influence the decision of the decision-making body to which it is addressed. *Id.* at 16, 119 S.Ct. 1827. The fact that a nurse does not act like a maitre'de at meal time is not material; Corley has not presented any evidence that the presence or absence of a nurse in the dining room had a tendency to affect any decision to stay at one of Defendants' homes.

Defendants' homes do employ double shifts when the morning shift arrives. The overlapping shifts may not be unique as claimed, but the practice occurs. Defendants have both RNs and LPNs on staff day and night seven days a week; either RNs or LPNs are present twenty-four hours a day, seven days a week. Finally, nurses give oral reports to doctors when the doctors visit the facility or when a need arises. These are regular reports; they may not be Corley's concept of "regular", but the difference is not material. Corley has failed to present evidence to show that the quoted language constitutes mail fraud.

---

10. Vera Corley received a choice of two entrees from October, 1989, to July, 1990. This tends to disprove any intent to defraud at the time that Mushrush made the representation to Corley about the two entree program.

**1112**

### E. *Guarantee of Continuing Care*

 The Defendants' promise of a guarantee of continuing care may constitute a pattern of racketeering activity. The evidence, when read in the light most favorable to Corley, shows that the Peoria and East Peoria homes began making misrepresentations about guaranteed care in 1989 and were still making them in 1995. This involved multiple representations over several years to a large number of people who suffered injury.

Neither Corley nor his mother, however, was injured by this scheme. Corley said the continuing care guarantee was only 5⁄10 of 1 percent of what he liked about the home; he said the guarantee was not a factor at all in his decision to place Vera Corley in the Peoria home. Furthermore, Vera Corley never needed Medicaid to pay her bill during her stay at the home; she, thus, did not suffer any harm from Defendants' failure to provide promised care to Medicaid residents in the Peoria home.

### F. *The Claimed Schemes Taken as a Whole*

 Even if the Court considers all of these claimed practices together, Corley still has failed to present sufficient evidence of a pattern of racketeering to overcome summary judgment. When evaluating evidence of a RICO pattern, this Court must consider: (1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries. *Vicom*, 20 F.3d at 780.

Corley's evidence, if believed by a jury, would show a small number and variety of separate schemes. The evidence shows only one repeated scheme of mail fraud:

advertising a guarantee of continuing care. Corley, however, suffered no injury from this scheme. The evidence, if believed by a jury, also shows isolated incidents: a bait and switch perpetrated on him, inadequate care for his mother, and termination of the experiment with offering two entrees. Other than that, he fails to show any other predicate acts that would even possibly constitute fraud.

Corley has provided almost no evidence of the number of victims or the occurrence of distinct injuries. He argues he is not required to prove either the existence of other victims or injury to those victims because injury is not an element of mail fraud. He is correct that reliance and injury are not elements of mail fraud, but the number of victims and the existence of distinct injuries are factors in determining whether a pattern of racketeering exists. He has presented virtually no evidence of other victims.[11]

Reading all of these factors favorably to Corley with the goal of reaching a " 'common sense' result recognizing that 'Congress was concerned in RICO with long-term criminal conduct,' " (*Vicom*, 20 F.3d at 780), the Court must conclude that the Defendants are entitled to summary judgment. Corley has presented evidence which, if believed, shows that Corley and his mother were injured by a bait and switch scheme and inadequate care; she also stopped receiving a choice of two entrees after eight months in the Peoria home. He has failed to show that these acts constitute a RICO pattern. The Defendants may have engaged in a pattern of racketeering activity in marketing a guarantee of continuing care in Peoria and East Peoria over a six-year period, but, Corley suffered no injury from this

---

11. The only other victims cited were the few who complained about care and the few plaintiffs in the *Hopp* case.

scheme. A "common sense" result does not allow Corley to bootstrap his isolated incidents onto a separate scheme that did not affect him or his mother to assert a RICO violation.

### G. *The Cover Up*

 Corley also claims that the Defendants engaged in fraudulent acts to cover up their fraud in order to allow the scheme to continue. Actions to hide a fraudulent scheme may be predicate acts if their purpose is to allow the scheme to continue. *Corley*, 142 F.3d at 1056. Corley, however, failed to establish that the Defendants engaged in a pattern of racketeering activity that injured him or his mother. Since the alleged cover-up activities did not further the continuation of a fraudulent scheme, they do not constitute predicate acts. *See e.g., Spiegel v. Continental Illinois Nat. Bank*, 790 F.2d 638, 649 (7th Cir.1986).

### *CONCLUSION*

Corley has failed to present sufficient evidence to demonstrate that a genuine issue of fact exists regarding whether Defendants engaged in a pattern of racketeering that injured either him or his mother. The Defendant's Second Motion for Summary Judgment is therefore allowed. The Court's decision renders moot Corley's Motion for Partial Summary Judgment (d/e 966). Corley argued that the state court decision in *Hopp* estopped Defendants from denying that the marketing of the guarantee of continuing care constituted a scheme to defraud. Even if this is true, Corley suffered no injury from that scheme, and so cannot recover. Similarly, Corley's Motion to Strike Affidavits Filed with Defendants' Response to Plaintiff's Motion for Partial Summary Judgment (d/e 1006) is moot, as is Defendants' Motion to Strike Declaration of Robert N. Corley (d/e 1015). These motions concern matters filed in support or opposition to

Corley's moot partial summary judgment motion.

The decision also renders moot the First Motion by Defendants Darrell Hoefling and Larry Vander Maten for Summary Judgment (d/e 1009). Corley's Motion to Strike Affidavits filed with Defendants' First and Second Motions for Summary Judgment (d/e 1042) is also moot because the matter sought to be stricken would not affect the decision. The Court did not rely on any assertions in the matter sought to be struck to reach the decision.

Therefore, the Second Motion by Defendants for Summary Judgment (d/e 1011) is ALLOWED. The Plaintiff's Motion for Partial Summary Judgment (d/e 966) is DENIED as moot. The First Motion by Defendants Darrell Hoefling and Larry Vander Maten for Summary Judgment (d/e 1009) is DENIED as moot. Plaintiff's Motion to Strike Affidavits Filed with Defendants' Response to Plaintiff's Motion for Partial Summary Judgment (d/e 1006) and his Motion to Strike Affidavits filed with Defendants' First and Second Motions for Summary Judgment (d/e 1042) are DENIED as moot. Defendant's Motion to Strike Declaration of Robert N. Corley (d/e 1015) is DENIED as moot. Plaintiff's Motion to Consider Exhibit References to Plaintiff's Statement of Undisputed Facts and Defendants' Statement of Undisputed Facts (d/e 1053) is ALLOWED. Motion by Defendants for Leave to File Amended Reply to Plaintiff's Statement of Undisputed Facts as Necessary (d/e 1055) is ALLOWED in part; the Amended Reply is allowed to be filed instanter. The Court reserves ruling on the request for attorneys fees. The Defendants' Motion for Reconsideration of Minute Entry of January 17, 2001, (d/e 1014) is DENIED as moot. The Motion for Sanctions (d/e 1025) and Defendants' request

for attorneys fees in the Motion for Leave (d/e 1055) remain before for the Court.

The Court enters summary judgment in favor of Defendants and against the Plaintiff Robert Corley, individually and as executor of the estate of Vera Corley, deceased, on the RICO claims alleged in the Sixth Amended Complaint, ¶¶ 1–235, excluding those paragraphs previously withdrawn or resolved in prior orders of this Court. The Court declines to assert supplemental jurisdiction over the state law claims set forth in the remainder of the Sixth Amended Complaint and so dismisses the remainder of the Sixth Amended Complaint for lack of subject matter jurisdiction. There is no just reason for delay in entry of the judgment in this matter. Fed.R.Civ.P. 54(b). The Clerk is directed to enter a Rule 58 judgment on this order.

IT IS THEREFORE SO ORDERED.