# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 01-3625 & 01-3642

ROBERT N. CORLEY, individually, and as executor
of the Estate of Vera M. Corley, Deceased,

*Plaintiff-Appellant, Cross-Appellee*,

and

RICHARD L. STEAGALL, JOHN P. NICOARA, THE LAW
FIRM OF NICOARA & STEAGALL, and SHERMAN COHN,

*Cross-Appellees*,

*v.*

ROSEWOOD CARE CENTER, INCORPORATED OF PEORIA,
an Illinois Corporation, DARRELL HOEFLING,
individually and as Trustee of the Darrell Hoefling
Revocable Trust, LARRY VANDER MATEN, individually
and as Trustee of the Larry Vander Maten Revocable
Trust and as General Partner of the Vander Maten
Family Limited Partnership, et al.,

*Defendants-Appellees, Cross-Appellants*.

_____

Appeals from the United States District Court
for the Central District of Illinois.
No. 95 C 3350—**Jeanne E. Scott,** *Judge*.

_____

ARGUED JANUARY 9, 2003—DECIDED OCTOBER 13, 2004

_____

Before RIPPLE, ROVNER and EVANS, *Circuit Judges*.

ROVNER, *Circuit Judge*.   Placing an elderly parent in a nursing home is a trying experience under the best of circumstances. Running a nursing home can also be challenging; the industry is highly regulated and the customers are often anxious and unhappy about the need for nursing home services. Needless to say, when a customer believes he has been defrauded and the proprietors of the establishment have been accused not just of fraud but racketeering, emotions can be expected to run high. One would hope their respective attorneys would be able to defuse the situation and litigate the case in a dispassionate manner. No such luck here: the parties and their attorneys have chosen the scorched earth model of litigation. This relatively simple case has generated more than one thousand entries in the district court docket. The record fills a back-breaking seven bankers boxes stuffed to bursting, and the briefs on appeal do little to untangle the mess the parties have made of the case. This is the second time we have reviewed a district court's grant of summary judgment against the plaintiff in this civil RICO action. We previously reversed and remanded a grant of summary judgment because the district court halted discovery before the plaintiff had a full opportunity to prove his case. Now that the plaintiff has been given every opportunity to make his case, we affirm the district court's grant of summary judgment because the plaintiff is still unable to produce enough evidence to demonstrate a viable RICO claim against the defendants here. The defendants have cross-appealed, arguing that the district court abused its discretion in declining to sanction the plaintiff for multiplying the proceedings in an unreasonable and vexatious manner. Finding no abuse of discretion, we affirm the district court's judgment in all respects.

**I.**

We will assume familiarity with our first opinion in this matter and repeat only what is necessary to the resolution of this appeal. *See Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041 (7th Cir. 1998) (hereafter "*Corley I*"). The cast of characters remains unchanged: Larry Vander Maten and Darrell Hoefling own and operate corporations and other entities that, in turn, own and operate a string of nursing homes. There are fourteen homes in this chain of ownership, each using the name "Rosewood Care Center." A holding company owns each nursing home's individual operating corporation. Each home uses the same management company, and each home's ownership and operation are organized through the same system of leases, management contracts and other agreements. Each home transfers revenues to the same central bank account. All of the homes use the same advertising brochure and all advertising is purchased centrally by a single management company. The nursing home at issue in this case is a Rosewood facility in Peoria, Illinois and we will refer to that home and the other defendants collectively as "Rosewood." That describes the universe of defendants in the case. The plaintiff is Robert Corley, who placed his mother, Vera Corley, in Rosewood and later came to regret his selection. Vera Corley's health precluded her from participating in decisions related to her care. Rosewood thus dealt directly with Robert Corley in all communications relevant to this lawsuit. Vera Corley was initially a plaintiff in the case, but when she died in 1999, the district court entered an order substituting Robert Corley as Executor of his mother's estate as a party plaintiff. Henceforth, we will refer to Robert Corley as "Corley" and to Vera Corley as "Vera" to avoid confusion.

Nearly all of the following facts are hotly contested by the parties but on summary judgment, we view the facts in the light most favorable to the party opposing summary judgment, drawing all reasonable inferences in that party's

favor. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Hence our recitation of the facts is heavily slanted in Corley's favor. Corley placed his mother, Vera, in Rosewood after visiting the home in October 1989. During his visit, he met with Valerie Mushrush, a Rosewood employee who showed him the facility and explained what Rosewood had to offer. Mushrush told Corley he could choose a private suite, a private room or a semi-private room for his mother. The private suite was the largest room and cost $70 per day, which was $12 more per day than the semi-private room. Corley was led to believe that any increase in the cost of the private suite would stay in line with price increases for the other room types. Mushrush told Corley that Rosewood allowed residents to bring their own furniture from home, gave residents a choice of two entrees at every meal and provided a high quality of care for residents. Mushrush had been instructed to market private suites to potential residents. She believed the prices for all of the rooms would not increase for one year and communicated that belief to some customers but did not recall telling Corley specifically. Significantly, Corley does not present any evidence regarding whether he was told prices would remain constant for a year, but instead focuses on the representation that when prices increased, they would increase proportionately for the private suites, private rooms and semi-private rooms. Rosewood's advertising at that time also included a guarantee of continuing care for residents whose assets were depleted. Under this guarantee, if a resident's money ran out, Rosewood represented that the resident could continue to live at the facility with the same level of care which would then be paid for by Medicaid.

Some of these representations were irrelevant to Corley and some were very important to his decision to place his mother in Rosewood. For example, his mother had sufficient assets to ensure that she would never need to use Medicaid to pay for her nursing home expenses, and thus the guaran-

tee of continuing care was irrelevant to Corley. On the other hand, it was important to Corley that his mother be able to stay in a private suite. He relied on Mushrush's representations about the cost keeping pace with the other room options when he decided to place his mother in a private suite, carpet it at his mother's expense, install a private phone line and move in her furniture from home. In reliance on this and other representations that we will discuss shortly, Corley signed a contract for a private suite at a base rate of $70 per day. The contract specified, "We do not guarantee your accommodations will remain private throughout your stay with us."[1] R. 3, Ex. 1. But Corley and Mushrush struck out a line that read "For administrative or other reasons, we may convert any private room to a semi-private room upon ___ days prior written notice, with an appropriate adjustment in your base rate." R. 3, Ex. 1. The contract permitted Rosewood to raise the base rate of any room at any time on 30 days notice. R. 3, ¶ XI.H. Contrary to the advertising regarding continuing care, the contract provided that Rosewood was not qualified to accept Medicaid patients and there was no guarantee that it would be qualified in the future.

Vera moved into Rosewood on October 25, 1989. About fifty days later, on December 14, 1989, Rosewood's administrator wrote a letter to Corley, suggesting that he move his mother to a regular private or semi-private room. According to the letter, the base rate on private suites was scheduled to increase from $70 per day to $84 per day in January 1990. This was a 20% increase. Corley objected to the increase by a letter dated December 31, 1989. He complained that he was the victim of a classic "bait and switch"

---

[1] This statement appears in a "welcome letter" appended to the contract. The parties have treated the welcome letter as part of the contract and for the purposes of this appeal, we will do so as well.

scheme. As a result of his complaint, Rosewood deferred the rate increase for Vera's room until March 1, 1990. On March 30, 1990, the base rate for all rooms rose an additional $4, increasing Vera's rate to $88. On October 24, 1990, the private suite base rate increased again to $122, a whopping 74% increase in one year. During the same time period, the base rate for semi-private rooms increased 13.7%, from $58 per day to $66 per day.

Corley complained to the Illinois Attorney General. Rosewood's attorney, Stephen Ukman, responded to the complaint on behalf of Rosewood in a December 18, 1990 letter (the "Ukman Letter") that was approved by Vander Maten. R. 1036, Ex. 12. Ukman explained that private suites were actually semi-private rooms equipped with only one bed. He claimed that at the time Vera Corley moved into Rosewood, management of the facility had advised Corley that "the availability and price of private suites was unique to the period when the facility was filling up, and were subject to change." *Id.* at 5. In other words, Rosewood admitted, consistent with the contract's warning that residents were not guaranteed a private room and consistent with the provision for price increases, that the price of private suites was anticipated to rise. Rosewood's statement that the base price in the contract was "unique" to the time period when the facility was filling up is a concession that the facility expected prices to rise with increased demand. This admission was also consistent with the contract, which provided for rate increases for any room at any time on thirty days' notice. The parties vehemently dispute whether Corley was told the base price was unique to the time period when the facility was first opening for business. Rosewood claims that it was completely forthcoming in its plans for the suites, and Corley contends he was misled. There is evidence in the record supporting both versions of this story. We accept Corley's version for the purposes of this appeal. Because it is a RICO case, though, much more than a single fraud (if

this is, in fact, a fraud) is needed to sustain the action. We therefore continue with Corley's story.

In addition to the pricing bait and switch, Corley complains that Rosewood failed to provide the high quality care he was promised and ended the two-entree program nine months after his mother moved in. Corley believed he was not the only person who fell for Rosewood's bait and switch scheme. When he filed his complaint, he alleged that others also were influenced to sign contracts with Rosewood because of these and other fraudulent representations by the defendants. In particular, he cited representations in Rosewood's sales brochure, which specified that (1) a nurse, not unlike a maitre d', would be available in the dining room to look after the quality of the food and service and the well-being of the residents during each meal; (2) Rosewood had a unique system of nursing shifts, with overlapping shifts in the morning so that residents could be greeted, changes in condition could be reported and morning routines could be completed; (3) Rosewood had registered nurses and licensed practical nurses on duty day and night, seven days a week; and (4) a physician would be given regular reports on the medical condition of the patients. He also cited to a state court lawsuit brought against Rosewood's East Peoria facility for violations of the Illinois Consumer Fraud Act based on the guarantee of continuing care. Eventually, four plaintiffs prevailed in that suit against Rosewood East Peoria. *See Hopp v. Rosewood Care Center, Inc. of East Peoria*, Case No. 92 L 74, Decision and Order of December 5, 1997.

Corley has sued Rosewood for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. According to Corley, the defendants systematically defrauded the residents of the Peoria and East Peoria homes with a classic bait and switch scheme. He alleged that the defendants used the mails in support of this scheme by mailing contracts and bills to residents,

actions which amounted to mail fraud by his estimation. When the defendants moved for summary judgment the first time, Corley's evidence in support of his allegations was thin and the district court granted judgment in favor of the defendants. On appeal, we reversed and remanded. *Corley I*, 142 F.3d at 1059. The appeal focused on whether Corley could establish a pattern of racketeering activity. One of the elements of a pattern, as we will discuss below, is continuity. That is, a plaintiff must demonstrate that the predicate acts making up the RICO claim amount to or otherwise constitute a threat of continuing racketeering activity. 142 F.3d at 1048. At the time the defendants first moved for summary judgment, the district court determined that Corley had evidence of five predicate acts of mail fraud occurring over a fourteen-month period against a single victim (himself). The district court noted that, although Corley alleged others had been damaged by the bait and switch scheme, he had no evidence in support of these allegations. We agreed with the district court that this evidence was too thin to satisfy the continuity requirement. However, because discovery had been prematurely halted, we remanded so that Corley would have a complete opportunity to develop evidence that other residents had fallen victim to Rosewood's misrepresentations, and that the mails had been used to support the scheme against these other victims. We suggested that Corley's allegations about similar misrepresentations made to other residents, if true, were sufficient to establish a pattern of racketeering activity under the RICO statute. 142 F.3d at 1050. In particular, we found compelling Corley's allegations of similar misrepresentations made to other residents and their families regarding the pricing of private suites, the two-entree program, and the guarantee of continuing care, combined with innumerable predicate acts of mail fraud occurring over a significant period of time directed against a substantial number of victims, all of whom experienced distinct injuries. 142 F.3d at 1050. We thus provided a

roadmap for Corley on remand, to seek discovery uncovering other victims of the bait and switch scheme and other instances of mail fraud on a scale that would suggest a threat of continuing racketeering activity. We were aware at the time that an Illinois court had found in favor of the *Hopp* plaintiffs on their Illinois Consumer Fraud case, and this too provided seemingly fertile ground for Corley to mine in support of his case.

On remand, the parties completed discovery and the defendants once again moved for summary judgment. The district court, mindful of where we left off, focused on the additional evidence Corley brought to light to supplement the five predicate acts we found too thin to support a RICO claim. *Corley v. Rosewood Care Center, Inc. of Peoria*, 152 F. Supp. 2d 1099, 1104 (N.D. Ill. 2001) (hereafter "*Corley II*"). First, Corley had submitted a few old price lists for other Rosewood homes. One of the lists was for the Swansea, Illinois home and was dated February 17, 1989 with an effective date of April 1, 1989. Another Swansea price list with an effective date of August 20, 1990 showed increased room rates similar to the charges Corley experienced in the Peoria home. Two other lists did not identify the homes to which they applied but showed room rates as of November 1, 1988 and January 1, 1990. The remaining price lists Corley submitted related to the Peoria Rosewood home where his mother lived, and reflected the price increases that Corley had already described.

On the two-entree issue, the court considered Corley's evidence that the Peoria home was the only Rosewood facility offering this perk and that the program ended thirteen months after it began. Corley also presented evidence to the district court that five residents had experienced inadequate care in contravention of Rosewood's promise to be a "high quality" facility. The court commented that the "evidence indicates that the homes were understaffed and budgets for food were inadequate." *Corley II*, 152 F. Supp. 2d at 1105-

06. The court did not cite the record in drawing this conclusion, which becomes problematic on appeal, as we will see below, when Corley invites us to rely on the district court's "finding" in this regard. Corley produced evidence on the brochure promises as well. He presented testimony that there was never a "nurse maitre d'" in the dining room at mealtime, that the "unique" system of staff overlapping at shift change was actually standard practice in the industry, that Rosewood followed Medicare regulations on nurse staffing and did not have both RNs and LPNs on duty all day everyday as represented in the brochure, and that oral but not written reports about residents were given to doctors serving the home.

Corley presented the strongest evidence of fraud on the guarantee of continuing care. Contrary to Rosewood's advertising, the Peoria home was never qualified to accept Medicaid patients. Rosewood's Peoria facility administrators told residents they would have to move to the East Peoria home if they wished to take advantage of the guarantee. Several did, and the East Peoria home later stopped participating in the Medicaid program and stopped providing care to existing Medicaid residents. As previously noted, several residents of the Peoria and East Peoria Rosewood homes brought state law fraud claims against Rosewood and won. *See Hopp v. Rosewood Care Center, Inc. of East Peoria*, Case No. 92 L 74, Decision and Order of December 5, 1997. The *Hopp* court noted that the defendants in that case were still advertising a guarantee of continuing care as late as 1995 in the Peoria area.

Finally, Corley claimed the defendants were engaged in what he characterized as a fraudulent attempt to cover up the racketeering at Rosewood. He cited the Ukman Letter and a number of pleadings and statements before the district court as evidence of the coverup.

The district court considered the evidence piecemeal at first and then analyzed it in terms of an overall scheme. For

the bait and switch pricing scheme, the court found that Corley had adequate evidence that, if credited, would show he had been the victim of a fraudulent scheme to induce him to contract with Rosewood for his mother's care. Specifically, Corley had evidence that he had been told the price differentials would remain relatively constant and that he was later pressured to move his mother to a semi-private room or pay exorbitant fees that were out of line with the costs of other types of rooms. The court considered the Ukman Letter to be evidence that Rosewood intended to raise the prices on private suites as soon as the home filled up and intended to turn the private suites into semi-private rooms in contravention of promises made to Corley at the time he signed the contract. The court found this evidence would be adequate to overcome summary judgment had Corley brought a simple fraud claim, but that more was required to support a RICO claim. Turning to Corley's other bait and switch evidence, the court declined to consider the submitted price lists in support of Corley's RICO claim because he was unable to show that these lists were ever actually used. Corley did not identify whether the lists were final or were simply drafts. Moreover, the court noted that sky-rocketing prices are not indicative of fraud in and of themselves; Corley failed to demonstrate that other residents were told, as he claims to have been told, that when rates increased, they would increase proportionately. Mushrush testified that she believes she told some prospective customers in 1989 that prices would stay fixed the first year of residency, but Corley has brought forth not one resident who claims to have been fraudulently induced to sign the contract on the basis of this representation, which conflicted with the plain language of the contract. In any case, the district court found that Corley had uncovered no additional evidence of bait and switch on the price of the private suite. *Corley II*, 152 F. Supp. 2d at 1108-10.

   The court turned to Corley's claim that Rosewood fraudulently represented that it provided high quality care for

its residents. Corley presented testimony from six former residents of Rosewood facilities, five from the Peoria facility and one from Edwardsville, that they were provided inadequate care. He also proffered statements from four former employees of Rosewood, three from the Peoria facility and one from Alton, that the homes in which they worked provided inadequate care. He produced documentary evidence that Rosewood had a policy to meet only minimum licensing requirements with its level of care. The district court found that this was "minimal evidence . . . too sporadic and anecdotal to establish that an issue of fact exists regarding whether Defendants' representations of quality care were either false or part of a scheme to defraud." *Corley II*, 152 F. Supp. 2d at 1110. The court also rejected Corley's claims about the two-entree program because the representation was made only to residents of the Peoria facility and only for thirteen months. Because the scheme was limited in time and duration, and because Rosewood delivered on the promise for those thirteen months, the court found that Corley failed to show that Rosewood's two-entree promises were part of a RICO pattern of mail fraud.

The court turned to the brochure representations regarding (1) the nurse maitre d'; (2) the unique system of double shifting the nursing staff at morning turnover; (3) the presence of RNs and LPNs twenty-four hours a day, seven days a week; and (4) the provision of regular reports to physicians. The evidence, according to the district court, demonstrated that most of these promises were kept and that the discrepancies, if any, were not material enough to constitute fraud. Although the parties agreed that no nurse ever acted as a maitre d' in the dining hall, the court found that Corley failed to show this was a material consideration for anyone deciding whether to enter a Rosewood facility. The court found that uncontroverted evidence demonstrated that Rosewood does employ double shifts at the morning shift turnover, and the only false part of the statement was

that this system was "unique." The court found that Rosewood does have either RNs or LPNs on staff twenty-four hours a day, seven days a week, just not both at the same time, necessarily, and thus substantially complied with the promise to have RNs and LPNs on duty day and night, seven days a week. Finally, the evidence demonstrated that the nurses in fact gave oral reports on the condition of the residents to physicians visiting the home and called a doctor when a particular need arose. The court found that, although these oral reports might not meet Corley's standard of "regular" reports, they largely met the language of the promise and thus there was no material misrepresentation. *Corley II*, 152 F. Supp. 2d at 1111.

The court found that Rosewood's failure to honor the guarantee of continuing care may constitute a pattern of racketeering activity. Construing the evidence favorably to Corley, the court found that Rosewood began making that misrepresentation in 1989 and continued through 1995, and that large numbers of people were harmed by that falsehood. Nonetheless, the court said, the Corleys were not injured by this misrepresentation because they did not rely on it in placing Vera Corley in Rosewood and because she never needed the assistance of Medicaid during her stay. *Corley II*, 152 F. Supp. 2d at 1112.

Considering all of the schemes as a whole, the court found Corley's evidence was inadequate to demonstrate a pattern of racketeering. The court found that the evidence, if believed, would show "a small number and variety of separate schemes." *Corley II*, 152 F. Supp. 2d at 1112. The evidence showed only one repeated scheme of mail fraud, related to the guarantee of continuing care. Corley suffered no injury from that scheme and the remaining evidence showed only isolated instances of possible fraud against Corley, relating to the pricing of private suites, the promise of high quality care and the two-entree program. The court noted that Corley provided almost no evidence of injury to

other victims (except for himself and the four *Hopp* plain-
tiffs), claiming that he was not required to do so because
injury is not an element of mail fraud. The court explained
that although injury is not an element of mail fraud, the
number of victims and the existence of distinct injuries are
factors in determining whether a pattern of racketeering
exists. The court ultimately found that a common sense
reading of the RICO statute would not allow Corley to
bootstrap his isolated instances of fraud onto a separate
scheme (the guarantee of continuing care scheme) that did
not affect him or his mother in order to make out a RICO
claim. Because Corley's evidence was insufficient to demon-
strate a pattern of racketeering, the court entered judgment
in favor of the Rosewood defendants.[2] Corley appeals.

## II.

On appeal, Corley complains that the district court erred
in holding that he must show injury from all wrongful acts
if they are to be considered predicate acts that establish a
RICO pattern. Corley boldly asserts that once this issue is
cleared up, he is in fact entitled to partial summary judg-
ment on the issue of pattern, apparently believing he has
proved pattern as a matter of law. He maintains that the
court erred in a number of threshold rulings that go to the
issue of pattern: first, he argues that the court should have
considered evidence from Rosewood's marketing coordinator
and a letter written by corporate counsel as creating an
inference that "bait and switch" on the private suites was
"company policy" and that the centralized marketing system
for the home created an inference that the policy was
carried out at least with other private suite residents if not
pervasively; second, he maintains the court erred in failing

---

[2] We will consider the facts related to the cross-appeal on
sanctions separately.

to recognize that there was one overall scheme of bait and switch, albeit with different falsehoods inducing different people to sign a Rosewood contract; third, he faults the court for removing from a jury the question of whether the promises made in the marketing brochure were material; and fourth, he contends that the court erroneously failed to consider certain admissions by the defendants under Rules 36(a) and 37(a)(2). The defendants have cross-appealed the district court's refusal to grant sanctions against Corley and we will consider that issue separately once we have resolved the main appeal.

We review *de novo* the district court's order granting summary judgment, viewing the facts and making all reasonable inferences that flow from them in the light most favorable to the non-moving party. *Ziliak*, 324 F.3d at 520; *Nelson v. Sandoz Pharmaceuticals Corp.*, 288 F.3d 954, 962 (7th Cir. 2002). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact for trial and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Neither party has made it easy for this court to determine whether there are genuine issues of material fact. Corley inexplicably spends most of his "Statement of Facts" reciting the allegations of his Sixth Amended Complaint, with only a handful of citations to the factual record. In the remainder of his brief, he cites liberally to the district court's opinion for the facts, a substantial problem for this court because the district court did not cite the record. We hasten to add the district court is not required to cite to the record. The appellants, however, are obliged to do so. Fed. R. App. P. 28(a)(7) ("appellants brief must contain . . . a statement of facts relevant to the issues submitted for review with appropriate references to the record."); Circuit Rule 28(c) ("Statement of the Facts. The statement of the facts required by Fed. R. App. P. 28(a)(7) shall be a fair

summary without argument or comment. No fact shall be stated in this part of the brief unless it is supported by a reference to the page or pages of the record or the appendix where that fact appears."). Corley has failed miserably and we will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him. "Judges are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Board of Regents of University of Wisconsin System*, 309 F.3d 433, 436 (7th Cir. 2002), *cert. denied*, 539 U.S. 941 (2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). The defendants have done only a little better. Clearly convinced that the main issue in the case is the district court's refusal to sanction the plaintiff, the defendants tell us over and over about the filings of various pleadings and devote perhaps a page or two to responding to Corley's version of the events making up the RICO claim. If the appellees are dissatisfied with the appellant's statement of facts, as is surely the case here, they are obliged to make their own properly supported statement of facts. Fed. R. App. P. 28(b)(4). In the end, as we shall see below, both sides have missed the main flaws in Corley's case, flaws alluded to by the district court, which granted judgment on another ground. The parties ultimately seem to concede (albeit with a few objections that we address herein) that the district court's version of events accurately represents the record as it may be construed in the best light for Corley, the non-moving party. With few modifications, we too rely on that version of events. The question then becomes whether these facts are legally sufficient to make out a RICO claim against Rosewood.

We begin with the basics of RICO for it is on the basics that Corley's claim rises or falls. Under the civil remedies portion of the RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United

States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). Section 1962 in turn provides, among other things, that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). There are, of course, other paths to RICO liability but Corley's theory of the case centers on section 1962(c) and that is therefore our focus. *See also H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232-33 (1989) (RICO renders civilly liable any person who, while employed by or associated with an enterprise that is engaged in interstate commerce, conducts or participates in the conduct of its affairs through a pattern of racketeering activity); *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992) (the elements of a RICO violation consist of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity). We look to section 1961 to determine what is meant by "racketeering activity" and find that it includes mail fraud (among other things). 18 U.S.C. § 1961(1)(B). It is on mail fraud that Corley rests his case and so we will shortly consider the requirements of making out a mail fraud claim. So far, then, we know that Corley must show he (1) was injured (2) by reason of (3) a violation of section 1962. To demonstrate a violation of section 1962, he must show the defendants conducted the affairs of the enterprise through a pattern of racketeering activity, in this case, mail fraud.

### A.

The district court (and the parties, for that matter) focused on the pattern requirement and we therefore turn

to that part of the analysis first. In *Corley I*, we noted that the viability of Corley's claim turns on whether he can establish that the defendants conducted the business of the Rosewood nursing homes through a pattern of racketeering activity. *Corley I*, 142 F.3d at 1048. To show a pattern of racketeering activity, Corley must demonstrate at least two acts of racketeering activity (called predicates); although two predicates are necessary, they may not be sufficient to establish a pattern. *H.J., Inc.*, 492 U.S. at 237. In *H.J., Inc.*, the Supreme Court looked to the common understanding of the word "pattern" as an "arrangement or order of things or activities," reasoning that a pattern is not formed by sporadic activity and that RICO liability will not attach simply because a person has committed two widely sepa-rated and isolated criminal offenses. *H.J., Inc.*, 492 U.S. at 239. Instead, the Court held, the term "pattern" itself requires a showing of (1) a relationship between the predicates, and (2) the threat of continuing criminal activity. *H.J., Inc.*, 492 U.S. at 239 (citing to the Congressional Record). In short, the Court said, "RICO's legislative history reveals Congress' intent that to prove a pattern of racke-teering activity a plaintiff or prosecutor must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." *H.J., Inc.*, 492 U.S. at 239 (emphasis in original). In *H.J., Inc.*, the Supreme Court "attempted to give definition to the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden variety fraud actions properly brought under state law." *Midwest Grinding*, 976 F.2d at 1022.

Although relationship and continuity appear to be analytically separate requirements, "in practice their proof will often overlap." *H.J., Inc.*, 492 U.S. at 239. Taking guid-ance from a similar "relationship" requirement in the Organized Crime Control Act of 1970, the Court defined the term thusly:

> Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

*H.J., Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). As for continuity, the Court noted that it is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *H.J., Inc.*, 492 U.S. at 241-42. Because we do not ultimately rest our conclusion on continuity, we will set that factor aside for the time being.

In *Corley I*, we commented that the " 'relationship' prong is relatively uncontroversial here. . . . Neither the defendants nor the district court have suggested that the core predicate acts comprising the alleged 'bait and switch' scheme are insufficiently related to satisfy the relationship prong." *Corley I*, 142 F.3d at 1048. We therefore accepted that the predicate acts were related and proceeded to consider continuity. Because Corley did not have an adequate opportunity to complete discovery, we remanded so that he could continue his attempt to demonstrate continuity. On remand, after full discovery, the relationship prong turned out to be more controversial than we anticipated.

The district court ultimately rested its judgment in favor of the defendants on Corley's failure to meet the relationship prong of the pattern requirement, although the court was somewhat circumspect in labeling the problem as such:

> [T]he court must conclude that the Defendants are entitled to summary judgment. Corley has presented evidence which, if believed, shows that Corley and his mother were injured by a bait and switch scheme and inadequate care; she also stopped receiving a choice of two-entrees after eight months in the Peoria home. He

> has failed to show that these acts constitute a RICO pattern. The Defendants may have been engaged in a pattern of racketeering activity in marketing a guarantee of continuing care in Peoria and East Peoria over a six-year period, but Corley suffered no injury from this scheme. A 'common sense' result does not allow Corley to bootstrap his isolated incidents onto a separate scheme that did not affect him or his mother to assert a RICO violation.

*Corley I*, 142 F.3d 1112-13. By characterizing the purported fraud against Corley as "isolated," labeling the guarantee of continuing care scheme as "separate," and finding that Corley may not "bootstrap" his claim onto the conduct that formed the basis of the *Hopp* case, the district court was essentially holding that the predicate acts were not sufficiently related.

Neither party picked up on this as being the controlling ground for the district court's decision and both sides gave it scant attention in their briefs. That does not relieve us of our duty to consider whether Corley has sufficient evidence to overcome summary judgment on this point. Corley's theory of the case is that the defendants engaged in an overarching scheme to fill their nursing homes by fraudulently inducing customers to sign contracts for nursing home services. Corley seems to hang his hat on our statement in *Corley I* that the relationship prong is relatively uncontroversial. He contends that our statement was still justified following full discovery. In Corley's view, although the particular fraudulent promise may have changed for each victim, (1) the purpose of the fraud was the same in each case, to induce a prospective customer to move into a Rosewood home; (2) the results were the same because contracts were in fact signed and residents moved in; (3) the victims were similar as they were all elderly persons needing nursing care or family members charged with the responsibility of finding nursing care for a loved one; and (4) the methods were similar

because the fraudulent statements were delivered in advertising, sales brochures and in oral statements during tours of the homes. We tend to agree that, if (and this turns out to be a big "if") Corley has enough evidence to demonstrate acts of fraud against himself and others as described above, then he has sufficiently demonstrated a triable issue on relationship. Summary judgment should not have been granted on that ground and to the extent the district court relied on the relationship prong of pattern to grant judgment against Corley, we disagree with that rationale.

## B.

We turn next to Corley's complaint that the district court's decision rested on a legal error related to the injury requirement. Corley contends that the court required him to prove that he was injured by each and every predicate act, contrary to our decision in *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806 (7th Cir. 1987). He maintains that he need only demonstrate injury to himself from one predicate act that is related to enough other predicate acts to constitute continuity. He adds that the other predicate acts making up the pattern need not have injured anyone so long as they satisfy the definition of mail fraud. Because a person may be found guilty of mail fraud without any showing that anyone relied on the fraud or was injured by it, he claims, he need not show injury from any predicate act directed towards other persons. We do not read the district court's opinion as requiring Corley to demonstrate injury from all of the predicate acts, although the court may have relied in part on such a rationale. As we discussed above, the district court's decision seemed to rest on a finding that the acts that injured Corley were isolated acts that were insufficiently related to the guarantee of continuing care scheme that injured others. In any case, Corley is correct (and the defendants seem to agree) that a plaintiff

need not demonstrate injury to himself from each and every predicate act making up the RICO claim. *Pate*, 819 F.2d at 810. In *Pate*, the question presented was whether a plaintiff, after proving predicate acts sufficient to constitute a pattern must prove that *every* act involved in the pattern also caused a direct injury to the plaintiff. 819 F.2d at 809. We noted that one of the factors tending to show the existence of a pattern of racketeering activity is the presence of multiple victims. *Id.* Moreover, requiring the plaintiff to prove injury from all of the predicate acts "would conflate what must be two separate inquiries: first, was there a pattern of racketeering activity violating RICO, and second, was the plaintiff injured by the RICO violation?" 819 F.2d at 809. Requiring a plaintiff to show injury from all of the acts adding up to a pattern would thus be illogical, especially because the acts might be somewhat distinct and separate in time. *Pate*, 819 F.2d at 810. We therefore held that a "plaintiff need not prove that it suffered injury from each (or more than one) predicate act constituting the pattern." *Pate*, 819 F.2d at 810. To the extent the district court required Corley to show injury from all of the predicate acts (and again, we do not necessarily read the district court's opinion to so hold), summary judgment should not have been entered on that basis.

### C.

Corley does need to demonstrate a triable issue of fact on injury to himself from at least one predicate act, though, and we turn finally to what Corley's evidence shows, construing it in a light most favorable to him. As we noted above, Corley must show that he was injured "by reason of" a violation of section 1962(c). *See* 18 U.S.C. § 1964(c) ("Any person injured . . . by reason of a violation of section 1962 of this chapter may sue therefor. . ."). This "by reason of" language requires a showing of both "but for" causation

and proximate cause. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). That is, Corley must show that but for the defendants' conduct he would not have been injured. He must also show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 269.

In addition to injury and causation, because Corley relies on the mail fraud statute as the source of the predicate acts making up his RICO claim, he must show a triable issue of fact on the elements of mail fraud: (1) the defendants' participation in a scheme to defraud; (2) the defendants' intent to defraud; and (3) the defendants' use of the mail in furtherance of the scheme to defraud. *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002); *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001); *United States v. Hickok*, 77 F.3d 992, 1002-03 (7th Cir.), *cert. denied*, 517 U.S. 1200 (1996). The words "to defraud" in the mail fraud context mean "wronging one in his property rights by dishonest methods or schemes" and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Hickok*, 77 F.3d at 1003 (quoting *McNally v. United States*, 483 U.S. 350, 359, 107 S. Ct. 2875, 2881 (1987)). "Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Britton*, 289 F.3d at 981. *See also Perlman v. Zell*, 185 F.3d 850, 854 (7th Cir. 1999) ("The word 'fraud' in the mail fraud statute means deliberate, material misrepresentation. . . . No fraud, no mail fraud."). Additionally, materiality of the falsehood is an element of the mail fraud statute, and so Corley must demonstrate a triable issue of fact on the materiality of the falsehoods he relied upon when he signed a contract and moved his mother into Rosewood. *Neder v. United States*, 527 U.S. 1, 25 (1999).

Corley argues that the scheme to defraud involved Rosewood making promises it had no intention of keeping

in the hopes of inducing people to move into Rosewood facilities. We will again recount the false promises Corley claims injured himself or his mother when he relied upon them to place his mother at Rosewood and to furnish her room with carpeting, a private phone line and his mother's personal furniture from home: (1) Corley contends that Mushrush told him that the price differential between private suites and other types of rooms would remain relatively constant; (2) he contends he was promised that his mother would be offered a choice of two entrees at each meal; (3) he claims he was told that Rosewood provided a high quality of care for its residents; (4) Rosewood's sales brochure represented that a nurse maitre d' would be present in the dining hall; (5) that same brochure claimed that Rosewood had a unique system of nursing shift overlaps; (6) the brochure promised LPNs and RNs would be on-site twenty-four hours a day, seven days a week; and (7) the brochure stated that regular reports would be provided to physicians regarding the residents' condition. For the purposes of this discussion, we will ignore the guarantee of continuing care because Corley was not injured by that promise and must therefore show injury from one of the other purported predicate acts in order to recover under RICO. We will analyze each of the seven promises to determine if they qualify as predicate acts on which to rest RICO liability.

**1.**

The centerpiece of Corley's case is Mushrush's alleged representation that when the prices of the private suites rose, the price differential between private suites and other types of rooms would remain relatively constant. Corley does not complain that the price of the private suite rose but only that when it did so, the increase was disproportion-

ate to price increases in other room types. Corley could not complain of fraud in the increase itself because the contract specified:

> The facility may increase its base rate at any time upon 30 days' prior written notice to the resident and resident's representative. Such change shall be effective on the 31st day following delivery or mailing of written notice as herein provided.

R. 3, at ¶ XI.H. The contract also provided that "[t]his Contract constitutes the entire agreement between the parties with respect to the subject matter hereof and may not be amended except by a writing signed by each of the parties." R. 3, at ¶ XI.B. Corley could hardly claim he was deceived or injured by a price increase in and of itself when that risk was explicitly disclosed in the contract. *See Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989) (a person who discovers the truth may not claim that a defendant's misrepresentation harmed him); *Perlman*, 185 F.3d at 855 (no fraud is involved when the defendants tell the plaintiff exactly what they were doing). A claim for injury based purely on price increase would also fall short because the contract allows a resident to terminate the contract at any time on 30 days' notice, and thus the resident has the unencumbered ability to avoid any price increase by terminating the contract and leaving the facility before the increase becomes effective. *See* R. 3, ¶ V.B. ("The resident may terminate this Contract at any time and all obligations under it by giving the facility at least 30 days' prior written notice of termination.").

So instead Corley complains about the disproportionate increase in the cost of private suites, a subject not covered by the contract but by an alleged oral representation from Mushrush, one of Rosewood's representatives. There are at least three significant problems with a fraud claim based on disproportionality. First, Corley does not explain how he

was injured by a disproportional rate hike when he signed a contract that contained no cap on prices at all. Put another way, he does not explain how he was injured when Rosewood failed similarly to raise the rates on other residents living in other types of rooms. We can guess what his theory is. Presumably, he believed that if rate increases were tied together for all room types, external market pressures on the home would keep the prices down generally. In other words, Rosewood would be constrained in raising the prices on private suites by the market pressures on semi-private rooms, for example. The problem with this argument is that Corley does not make it anywhere in his briefs or in the court below. Consequently, he has presented no evidence of whether this market pressure theory would have been borne out in practice and we thus have no way of knowing if he was injured by the failure to tie room rate increases together. We do not know anything about the market for any types of nursing home rooms during the relevant time period. We will not make Corley's market pressure argument for him. "This court is not obliged to comb the record without guidance looking for facts that might call the district court's holding into question, or to conduct the legal research necessary to construct an argument from those facts." *Reynolds*, 882 F.2d at 1254. Second, a market pressure theory would suffer the same infirmity that a claim for fraud based on pure price increase suffers— because Corley had the ability to terminate the contract before any price increase took place, he could not claim to have been injured by the increase. If fraud was Rosewood's aim, it went about the process in a very unlikely manner by giving residents an absolute out that would protect them from injury.

Even if we consider as injury the cost of installing carpeting and a private phone line, Corley must demonstrate fraudulent intent and he has failed to do so in this instance. This is the third flaw in Corley's theory. As we discussed

above, mail fraud requires a showing of specific intent to defraud. This in turn requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another. *Britton*, 289 F.3d at 981. Corley must provide some evidence that, if believed by the jury, would tend to show that at the time Mushrush made this representation, Rosewood had no intention of honoring it. Corley points to two pieces of evidence in support of fraudulent intent. First, Rosewood in fact increased prices in a disproportionate manner after promising not to do so. This is a recurring theme in Corley's arguments and we will address it here briefly. The fact that Rosewood subsequently broke a promise is not evidence that it never intended to keep the promise when made. At most this is evidence of breach of contract, not fraud. Fraud requires much more than simply not following through on contractual or other promises. It requires a showing of deception at the time the promise is made. A subsequent breach, although consistent with deceptive intent is not in and of itself evidence of such an intent.

Second, Corley relies on the Ukman Letter as evidence that Rosewood never intended to keep its promise to raise room rates proportionally. Recall that the Ukman Letter was drafted by Rosewood's attorney in response to an inquiry from the Illinois Attorney General after Corley lodged a complaint with that office. We have reviewed the Ukman Letter and find nothing in it that indicates that Rosewood intended to deceive Corley at the time Mushrush told him the price differentials would remain relatively constant. We will recount here the passages of the Ukman Letter that address Corley's pricing complaints. In defending Rosewood against Corley's charges of extortion and fraud, Ukman conceded that the cost of a private suite had "increased substantially since Mrs. Corley was admitted to the facility" but that other, less expensive private rooms were still

available, as were private suites at other comparable homes where there was less demand for the suites and therefore lower costs. R. 1036, Ex. 12, at 3. Ukman noted that when Vera Corley was first admitted to Rosewood, she was given a discount of $14 per day off the usual price of a private suite (a fact that Corley states he was never told). According to Ukman, the first increase in price, detailed in a December 14, 1989 letter to Corley, "was brought on by the mush-rooming occupancy of the facility and demand for beds." R. 1036, Ex. 12, at 4. The next increase was a $4 per day across the board increase in all room rates "necessitated by addi-tional costs of running the facility[.]" The next increase, from $88 to $122 per day was "brought about by the continuing growth of the facility." According to Ukman, the facility was so full it was turning away individuals in need of care. *Id.* In response to the charge that Corley had been the victim of a bait and switch scheme, Ukman pointed out that the contract itself provided for rate increases at any time on 30 days' notice. Further, at "the time Mrs. Corley was admitted, management of the facility advised Mr. Corley that the availability and price of private suites was unique to the period when the facility was filling up and were subject to change." *Id.* at 5. Ukman told the Attorney General that private suites were more expensive because the residents were paying for the privilege of occupying a room licensed by the State for two people, and that the premium increased as occupancy rose. Simply put, "[r]ate increases were the result of increasing occupancy and costs of doing business." *Id.* at 6. In response to a claim by Corley that Rosewood planned the rate increases and that their intent was "misstated and fraudulent," Ukman responded thusly:

> Though rate increases for private suites were certainly anticipated (and provided for in paragraph XI H. of the contract), the amount and timing of them could not pos-sibly have been planned. These increases depended al-

most entirely on the growth in occupancy, which was totally unpredictable.

*Id.* at 7. From this, Corley would have us assume that the Rosewood defendants knew ahead of time that the demand for private suites would far outpace the demand for more modestly priced private rooms and semi-private suites. Nothing in the Letter indicates such knowledge and fore-thought on Rosewood's part. Both Corley and the district court read too much into the Ukman Letter and Corley lacks any proof of fraudulent intent on the price differential claim. "Not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme to defraud.' . . . Given the pervasive use of the mails along with the ease of satisfying the mailing requirement, such a broad meaning of fraud for the mail fraud statutes would put federal judges in the business of creating common law crimes." *Reynolds*, 882 F.2d at 1252. Because Corley cannot show he was injured by the promise of proportional pricing and cannot show that the defendants intended to deceive him when Mushrush made that promise, it cannot form the basis of a RICO claim.

## 2.

We turn to the promise of a choice of two entrees at every meal. This program was unique to Rosewood's Peoria facility and was in effect from June 1989 through July 1990, for approximately thirteen months. Corley has literally no evidence of fraudulent intent in the making of this promise and simply relies on the fact that the program ended nine months after his mother entered the facility as evidence that the defendants did not intend to carry through on this promise when they made it. This is the flimsiest of Corley's claims because the home did in fact operate the two-entree program for a substantial period of time before terminating

it. Corley does not claim he was ever told, for example, that the program would be offered in perpetuity like the guarantee of continuing care. Without any evidence of fraudulent intent, the cancellation of the two-entree program cannot qualify as a predicate act for the purposes of RICO.

**3.**

Next is Corley's claim that he was told that Rosewood provided a "high quality" of care for its residents. According to Corley, the home had a policy of meeting minimum State nursing requirements and thus never intended to provide "high quality" care to its residents. The phrase "high quality" is highly subjective. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1330 (7th Cir. 1994) (labels like "poor quality" are inherently subjective expressions that are ill-suited as the basis for mail and wire fraud claims). Without elaboration, it comes under the category of sales puffery upon which no reasonable person could rely in making a decision and therefore it does not qualify as material. *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (promotional mailings from casino representing that "Players win!" and "the winning is big," among other things, are nothing more than sales puffery on which no person of ordinary prudence and comprehension would rely); *Associates In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir. 1991), *cert. denied*, 502 U.S. 1099 (1992) (fraud occurs only when a person of ordinary prudence and comprehension would rely on misrepresentations; no reasonable person would rely on puffery that an investment will earn the "highest" rate of return). A generic promise to provide "high quality" services cannot therefore be the basis of a mail fraud claim. In any event, this alleged misrepresentation suffers the same flaw as the others because Corley has no evidence that Rosewood intended to provide anything other than high quality services when it made this statement in its advertising materials.

**4.**

Rosewood's sales brochure also represented that a nurse maitre d' would be present during meals. Specifically, the brochure stated, "A nurse, not unlike a maitre de [sic], looks after the quality of food, service and well-being of the guests during each meal." R. 1035, Ex. 1, at 8. Corley presented evidence that no nurse acted like a maitre d' during meal times. The district court found that statement regarding the presence of a nurse maitre d' was not material. The court noted that Corley presented no evidence that the presence or absence of a nurse maitre d' had a tendency to affect anyone's decision to stay at a Rosewood facility. Corley argues that materiality is an issue for the jury, not the judge. He suggests that the mere fact that Rosewood included this statement in the brochure indicates that Rosewood thought it was material to prospective residents. This argument is a non-starter. Sales brochures contain all sorts of puffery. To turn every statement in a sales brochure into a material representation that could form the basis of a RICO claim would lead to absurd results. The same section of the brochure states, "Mealtimes are social gathering times for residents who often get together early to talk." Corley's argument would lead to the ridiculous result that Rosewood could be sued for fraud if his mother found herself without a social companion with whom to converse before the meal hour. Materiality will in many circumstances be an issue of fact for a jury, but not here. Nurses were available at all times; the fact that none were present in the dining room to act as a maitre d' would not be material to any reasonable person. If Corley wanted to get the issue before a jury, he should have produced evidence that this statement influenced at least some of the prospective residents in making their decision to move into Rosewood. *See Neder*, 527 U.S. at 16 (a false statement is material if it has a natural tendency to influence or is capable of influencing the decision of the decision making

body to which it was addressed). This claim fails for lack of any evidence on materiality.

**5.**

The brochure also claimed that Rosewood had a unique system of nursing shift overlaps. As the district court pointed out, the only part of this statement that proved to be false was that the system may not have been "unique" but may have been a common practice at health care facilities. Corley's argument on this point suffers a number of flaws. First, he again lacks any evidence that the defendants had a fraudulent intent when making this statement. Second, he fails to show that Rosewood's actual performance of this promise differed in any material way from what was represented in the brochure. Third, he again fails to present any evidence that this statement was material to anyone deciding whether to enter Rosewood. All of these deficiencies mean that this alleged misrepresentation may not serve as the basis for a mail fraud claim.

**6.**

Nor is there any merit to Corley's claim that Rosewood acted with fraud when the brochure promised LPNs and RNs would be on-site twenty-four hours a day, seven days a week. As the district court noted, either LPNs or RNs and sometimes both were in fact on duty twenty-four hours a day, seven days a week. Rosewood followed Medicare regulations which required that one RN be on the Medicare hallway at least one shift during the twenty-four hour day, and either LPNs or RNs were to be on duty on every shift. Under the district court's reading, this staffing was sufficient to meet the statement in the brochure. Corley takes issue with the district court's interpretation of the brochure and offers his own reading. In his view, the brochure repre-

sented that more than one RN would be present and that both RNs and LPNs would be present day and night. The actual statement in the brochure reads, "Registered nurses and licensed practical nurses are on duty day and night seven days a week." R. 1035, Ex. 1, at 15. As we read the statement, it is open to interpretation regarding how many nurses will be present and what their level of training will be. What is clear is that nurses will be present at all times and nurses were in fact present at all times. An indefinite statement like this is not the stuff of which fraud claims are made. Corley has presented no evidence that the Rosewood defendants intended to deceive anyone when they placed this statement in their brochure, or that they intended not to have adequate staffing. Corley points to a handful of situations where the care provided to some residents was inadequate, but a breach of the standard of care is not evidence that Rosewood intended from the start to mislead prospective customers about the number of nurses present for each shift. This claim too fails for lack of evidence.

**7.**

Finally, Corley complains that the brochure stated that regular reports would be provided to physicians regarding the residents' condition when in fact nurses provided oral reports to doctors only when those doctors visited the home, and also called doctors when there was a specific need. Corley contends these are not "regular" reports and that only a jury can decide what a reasonable person would understand by "regular" in the context of the entire brochure. Again, "regular" is a subjective word in this context, and the district court was quite correct to find that Corley could not base a fraud claim on this statement. And, for the final time, we must point out that Corley has presented literally no evidence that the defendants intended to deceive anyone

when they made this statement. The final nail in the RICO coffin for this claim is a lack of any proof that this promise would be material to a reasonable person placing a loved one in a nursing home. A reasonable person would certainly expect a physician to be notified when there is a need but Corley's vision of "regular" reports being provided even when there was no particular need is too idiosyncratic to be considered material in the absence of any evidence that anyone else found this promise to be determinative.

All of this boils down to one conclusion. Corley has failed to produce evidence of any predicate act that injured himself or his mother. Although Rosewood may have breached some of the promises it made to Corley and other residents, none of these breaches rose to the level required to prove fraud. As we discussed above, for each allegedly breached promise, Corley failed to produce evidence on a key element of the fraud claim. Sometimes the evidentiary deficit related to injury, sometimes to intent, sometimes to materiality and sometimes to all three of those necessary elements. Even if we assume that Corley has adequately demonstrated a pattern of racketeering activity related to the guarantee of continuing care, he must also show a related predicate act injuring himself or his mother. This he has failed to do. The district court was therefore correct to enter summary judgment in favor of the defendants.

## D.

We take this opportunity to tie up a few loose ends from Corley's appeal. Needless to say, in light of our analysis, Corley is not entitled to partial summary judgment on the issue of pattern. We do not need to decide whether the district court erred in its treatment of certain inspection records of the Illinois Department of Public Health. Corley offered these reports to demonstrate the poor quality of care provided to Rosewood residents. The records are irrelevant

in light of our conclusion that Corley lacked evidence that Rosewood intended to provide poor care at the time it promised high quality care. Nor do we need to consider Corley's collateral estoppel argument relating to the effect of the *Hopp* judgment on this case. Because Corley has failed to produce evidence of acts of mail fraud injuring himself or his mother, the defendants' treatment of the *Hopp* plaintiffs is irrelevant here. We have reviewed the remainder of Corley's arguments and find them similarly without merit.

## III.

We turn now to the defendants' cross-appeal on sanctions. Rosewood sought sanctions against Corley under 28 U.S.C. § 1927 and under Rule 11. Section 1927 provides in relevant part:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Rule 11 provides, among other things, that when an attorney presents a pleading or written motion to the court, that attorney:

> is certifying that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,—
>
> (1)     it is not presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2)     the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modifi-

cation, or reversal of existing law or the establish-
ment of new law;

(3)    the allegations and other factual contentions have
evidentiary support or, if specifically so identified,
are likely to have evidentiary support after a rea-
sonable opportunity for further investigation or
discovery[.]

Rule 11(b). Rule 11(c) provides that, if, after notice and a
reasonable opportunity to respond, a court determines that
Rule 11(b) has been violated, the court may, subject to cer-
tain conditions, impose an appropriate sanction upon the
attorneys who violated Rule 11(b). As a condition for im-
posing sanctions by motion of another party, that party must
serve the motion for sanctions on the offending attorney
twenty-one days before filing it with the court. The motion
for sanctions must describe the specific conduct that is al-
leged to violate Rule 11(b), and may be filed with the court
only if the offending attorney fails to withdraw or correct
the improper pleading or motion within those twenty-one
days. Rule 11(c)(1)(A).

## A.

The defendants sought Section 1927 sanctions based on
a number of motions that they maintain were filed to
harass Rosewood, cause unnecessary delay in the proceed-
ings and needlessly increase the cost of the litigation.
Among these motions were (1) six pleadings accusing
Rosewood and its lawyers of furthering the RICO conspiracy
by seeking to evade service of process; (2) four motions
seeking to disqualify defense counsel; (3) an unstated num-
ber of motions seeking advisory opinions; and (4) eighteen
motions challenging the district court's rulings. The defen-
dants also complain that Corley and his attorneys have
engaged in "extremely negligent, reckless and indifferent
conduct in the pursuit of the RICO claim." Defendants'

Brief at 48. This reckless conduct includes pursuing a RICO claim that was unsupported by the facts when it was first filed, and then failing to follow the guidelines set forth by this court on remand after *Corley I* by failing to seek discovery regarding the purported victims of Rosewood's alleged fraud.

Rosewood sought Rule 11 sanctions for similar reasons. Specifically, Rosewood argued to the district court that Corley's RICO claims were filed and pursued without foundation in law or fact. Rosewood also moved for Rule 11 sanctions on the ground that Corley had brought the RICO claim and accompanying motions for an improper purpose, namely, to force settlement of a spurious claim, to harass the defendants, cause unnecessary delay and needlessly increase the cost of litigation. Moreover, Rosewood sought Rule 11 sanctions for disparaging and abusive comments made by Corley and his lawyers in pleadings and in oral argument before the district court.

The district court entered two orders relating to Rosewood's requests for sanctions. In the first, the district court declined Rosewood's request for Rule 11 sanctions sought because Corley included paragraphs in his Sixth Amended Complaint that had been dismissed by the court, and included a defendant that had been previously dismissed from the case. The district court refused to sanction Corley for these infractions because Rosewood failed to comply with Rule 11(c). Rule 11(c) requires a party seeking Rule 11 sanctions to give the other party notice and twenty-one days to correct the problem. Because Rosewood's notice to Corley simply requested that he withdraw the Sixth Amended Complaint and did not specifically mention the six offending paragraphs (out of more than two hundred paragraphs) or the dismissed defendant, the court found the notice was inadequate under Rule 11(c). The court also declined to award sanctions under either its inherent power or under Section 1927 because the court found no evidence of bad faith in Corley's filing of the Sixth Amended Complaint. The

court specifically found that Corley did not act unreasonably or vexatiously in filing the Sixth Amended Complaint, and thus declined to award Section 1927 sanctions. *See* Order, July 27, 2001.

In its second Order, the court again declined to sanction Corley under Rule 11, finding that Corley had a good faith basis to proceed to summary judgment on his RICO claims because of the evidence of rapid price increases at other Rosewood homes shortly after opening. As for Section 1927 sanctions, the court found this was a closer call:

> The more difficult question is whether Corley and his attorneys engaged in vexatious litigation tactics that unreasonably drove up the cost of this case. The Court believes that Corley and his attorneys acted unreasonably and increased costs by filing innumerable motions to rehash virtually every ruling that was unfavorable to them. At least some of this incessant, repetitious papering of the Court and opposing counsel was unreasonable, if not vexatious.

> The problem is that the Defendants also seem to the Court to be guilty of unreasonable litigation tactics. For example, the Defendants started this case by spending over a year litigating service of process. Both parties seem to have decided from the outset to fight tooth and nail. The Court will not put the blame for the outrageous delays and expenses in this case solely at the feet of Corley and his attorneys. The Court, therefore, will not sanction Corley or his attorneys in this case for their unreasonable litigation tactics.

*See* Order, September 6, 2001, at 5-6.

Rosewood appeals the district court's refusal to sanction Corley and his attorneys on several grounds: (1) having found that Corley acted "unreasonably, if not vexatiously" the court erred in refusing to grant sanctions under Section 1927; (2) the court erred in basing the Section 1927 decision in part on a finding that the defendants spent a year

litigating service of process; (3) the court erred in finding that evidence of rapid price increases in other Rosewood homes gave Corley a good faith basis to proceed to summary judgment on his RICO claim; (4) the court erred in refusing to grant Rule 11 sanctions because Corley filed to conduct a reasonable inquiry into the facts before asserting there were 50,000 victims of Rosewood's business practices; (5) the court erred in refusing to grant Rule 11 sanctions because Corley failed to conduct a reasonable inquiry into the law; and (6) the court erred in refusing to sanction Corley under Rule 11 because Corley brought the RICO claim and ancillary motions for an improper purpose.

## B.

We review a court's Rule 11 determination for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Independent Lift Truck Builders Union v. NACCO Materials Handling Group, Inc.*, 202 F.3d 965, 968 (7th Cir. 2000); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995). We will find abuse of discretion only where "no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Lorentzen*, 64 F.3d at 330. The central goal of Rule 11 is to deter abusive litigation practices. *Cooter & Gell*, 496 U.S. at 393. Because the district courts have the best information about the patterns of their cases, they are in the best position to determine whether a legal position is far enough off the mark to be frivolous or whether an attorney conducted an adequate inquiry under the particular circumstances of a case. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933 (7th Cir. 1989) (*en banc*). *See also Brandt v. Schal Assoc., Inc.*, 960 F.2d 640, 645 (7th Cir. 1992) (decisions concerning Rule 11 sanctions are best left to the discretion of the district court which has a bird's eye view of the actual positions taken by the litigants). With that

deference in mind, we see no reason to overturn the district court's decision not to impose sanctions under Rule 11. The main thrust of Rosewood's argument is that the district court erred in assessing the evidence when it found that evidence of rapid price increase in private suites provided a good faith basis to go forward with the case. According to Rosewood, this error led to the district court's erroneous denial of Rule 11 sanctions. Although the court may have been mistaken about the relevance of the rapid price increase evidence, it is unlikely that that error would change the result of the sanctions decision. After all, if the district court itself believed this evidence to be relevant, it was unlikely to fault Corley for suffering the same misapprehension. Under the circumstances, we see no reason to remand to the district court to determine whether this new view of the evidence would change the sanctions decision. We hasten to add that the converse would not necessarily be true. That is, if the district court had granted sanctions based on an erroneous view of the relevance of the evidence, a reversal of sanctions would be necessary as an abuse of discretion. Nor do we see any reason to reweigh the district court's decision not to award Rule 11 sanctions on any of the other bases cited by Rosewood. The focus in Rule 11 sanctions is on what counsel knew at the time the complaint was filed, not what subsequently was revealed in discovery. *Beverly Gravel, Inc. v. DiDomenico*, 908 F.2d 223, 226 (7th Cir. 1990). We follow the district court's lead in declining to judge Corley's actions in filing the lawsuit with the 20/20 vision of hindsight. The fact that the underlying claim turned out to be groundless does not necessarily mean that Rule 11 sanctions are appropriate (much less required). *Beverly Gravel*, 908 F.2d at 227. The district court, viewing the case as a whole, simply did not believe that Corley's claims were filed in bad faith or for an improper purpose or without adequate investigation. We therefore affirm the district court's denial of Rule 11 sanctions.

## C.

A district court's decision regarding Section 1927 is also reviewed for abuse of discretion. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1183 (7th Cir. 1992); *Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988). Rosewood has two main objections to the district court's ruling on Section 1927. First, having found that Corley acted unreasonably, if not vexatiously, Rosewood contends it was error not to sanction him. We can dispatch this argument quickly. Section 1927 is permissive, not mandatory. The court is not obliged to grant sanctions once it has found unreasonable and vexatious conduct. It may do so in its discretion. That leads to Rosewood's second objection, namely that the court erred in finding that Rosewood itself contributed to the outrageous delays and expenses with its own unreasonable litigation tactics. Rosewood's argument on Section 1927 is a good example of what frustrated the patient district court judge. Rosewood curiously spends many pages of its brief attempting to convince this court that Corley and his attorneys behaved unreasonably and vexatiously. But the district court found in Rosewood's favor on this point and this lengthy recitation of Corley's conduct was thus unnecessary. Rosewood does briefly address the basis for the district court's ruling, namely, its belief that Rosewood contributed to the delay and expense. But this argument too falls short as it asks us to simply reweigh the district court's decision. In no uncertain terms, the district court who presided over the thousand-plus filings in this case found that Rosewood should bear at least part of the responsibility for the accompanying delay and cost. Under the deferential standard of review for Section 1927 sanctions, we affirm the district court's sound decision.

## IV.

For all of the reasons stated above, we affirm the district court's grant of summary judgment in favor of the defendants

and also affirm the district court's denial of sanctions against the plaintiff and his attorneys.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*